## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

ZEKEBIA ALFORD,                          :
                                         :
      Plaintiff,                         :
                                         :        CASE NO.: 1:14-CV-00004 (LJA)
v.                                       :
                                         :
MITCHELL COUNTY, GEORGIA;                :
BILL TERRY, Individually, and in his     :
Official Capacity as Warden of           :
MITCHELL COUNTY                          :
CORRECTIONAL  INSTITUTE;                 :
                                         :
      Defendants.                        :
_____  :

## ORDER

Before the Court is the Motion for Summary Judgment filed by Defendant Mitchell County, Georgia ("Defendant County"), and Bill Terry, individually, and in his official capacity as Warden of Mitchell County Correctional Institute ("Defendant Terry") (collectively, "Defendants"). (Doc. 11). For the reasons that follow, Defendants' Motion for Summary Judgment, (Doc. 11), is **GRANTED**.

## FACTUAL BACKGROUND[1]

Plaintiff Zekebia Alford is an African-American female. (Doc. 15 ¶ 1). On November 5, 2012, Plaintiff started working for Defendant County as a correctional officer at the Mitchell County Correctional Institute ("the Prison"). (*Id.* ¶ 2). Some of the correctional officers who work at the Prison are responsible for supervising inmate work details, and those

---

[1] The relevant facts are derived from Plaintiff's Complaint (Doc. 1); Defendants' Answer (4); Plaintiff's Application for Employment (Doc. 13-1); Defendants' Payroll Status Change Form (Doc. 13-2); November 28, 2012 Memorandum from Tompkins to Defendant Terry (Doc. 13-3); Affidavit of Joe Frazier (Doc. 14); Plaintiff's Deposition Transcript ("Pl. Depo.") (Docs. 17 and 17-1); and Defendants' Statement of Undisputed Facts (Doc. 15); and the record in this case.

officers are hereinafter referred to as "Detail Officers." (*Id.* ¶ 3). Other correctional officers who work at the Prison only work inside the Prison, and those correctional officers are hereinafter referred to as "Building Officers." (*Id.* ¶ 4). For the most part, Building Officers are divided into teams that are referred to as "Keys." (*Id.* ¶ 6). Ordinarily, a Key consists of three to four correctional officers, with one of those officers serving as the supervisor of the Key. (*Id.* ¶ 7). There are two day shift Keys and two night shift Keys. (*Id.* ¶ 8).

When Plaintiff started working at the Prison on November 5, 2012, one of the day shift Keys was supervised by Ronald Mock ("Mock"), who is a Caucasian male. The other day shift Key was supervised by Joe Frazier ("Frazier"), who is an African-American male. (*Id.* ¶ 9). Plaintiff was initially assigned to the Key supervised by Mock. (*Id.* ¶ 10). Plaintiff worked on Mock's Key on November 5, 6, 9, 10, 11, 14, and 15 of 2012. (*Id.* ¶ 11). On November 19, 2012, Charles Griffin ("Griffin") became the supervisor of the Key that had been supervised by Mock. Griffin is also a Caucasian male. (*Id.* ¶ 12).

As a security measure, two Building Officers walk through the dormitories nine times every day to count the inmates. (*Id.* ¶ 13). After the Building Officers have counted the inmates inside the Prison, the Building Officers make a verbal report to the Building Officer working in the control room ("Control Room Officer"). (*Id.* ¶ 14). Detail Officers working with inmates outside of the Prison call the control room every hour. (*Id.* ¶ 15). The Control Room Officer is responsible for receiving and recording the count, location, and status reported by each Detail Officer. (*Id.*)

While Plaintiff was employed by Defendant County, Plaintiff worked primarily as a Control Room Officer. Plaintiff had difficulty receiving and recording the count. (*Id.* ¶¶ 16 and 17). According to Plaintiff, that the manner in which counts were conducted at the Prison was "kind of tricky," and it was "not the normal way count[s] [are]done at other prisons. . . ." (*Id.* ¶ 18). Plaintiff explained that there was a "big difference" between the manner in which count was conducted at the Prison and at prisons where Plaintiff previously worked—Lee State Prison and Calhoun State Prison. (*Id.* ¶ 19). In addition, Plaintiff explained that there were occasions when sick inmates returned from their work

details but the Control Room Officer was not told.  (*Id.* ¶ 20).  Because of this, any subsequent count recorded by the Control Room Officer would be wrong.  (*Id.* ¶ 20).  Plaintiff estimated that this occurred "at least every other day" that she worked.  (Pl. Depo. at 51:16).

On November 20, 2012, Defendant Terry and Deputy Warden Billy Tompkins ("Tompkins") met with Plaintiff to see whether they could assist Plaintiff with her duties related to the count.  (Doc. 15 ¶ 22).  Plaintiff told Defendant Terry and Tompkins that she was having a difficult time working with Griffin.  (*Id.* ¶ 23).  Following her meeting with Defendant Terry and Tompkins, Plaintiff was transferred to the Key supervised by Frazier.  (*Id.* ¶ 24).  Plaintiff worked on Frazier's Key on November 21, 22, 26, and 27 of 2012.  (*Id.* ¶ 25).  On November 27, 2012, Frazier approached Defendant Terry and Tompkins and expressed frustration with Plaintiff's continued inability to take an accurate count.  (*Id.* ¶ 26).  Later that day, Defendant Terry and Tompkins met with Plaintiff and again discussed Plaintiff's difficulties with the count.  (*Id.* ¶ 27).  On November 28, 2012, Tompkins wrote a memorandum outlining the difficulties Plaintiff was having and recommending the termination of Plaintiff's employment.  (*Id.* ¶ 28).  On December 6, 2012, Defendant Terry terminated Plaintiff's employment.  (*Id.* ¶ 29).

Plaintiff complains that Griffin harassed her during the time that she worked at the Prison.  (*Id.* ¶ 30).  According to Plaintiff, Griffin: (a) called her "girl" and told her that she was not supposed to be working at the Prison because she was a girl; (b) threw keys at her; and (c) told her that she was weak.[2]  (*Id.* ¶ 31).  Griffin referred to Plaintiff as a "girl" on more than one occasion although Plaintiff could not recall any specific date on which Griffin did so.  (*Id.* ¶¶ 32 and 33).  According to Plaintiff, Griffin's references to her as a "girl" were the only race-based comments that Griffin made to her.  (*Id.* ¶ 34).

Plaintiff further complains that Griffin threw a set of keys at her.  According to Plaintiff, she gave Griffin a set of keys at some point.  (*Id.* ¶ 35).  After Griffin used the keys, he returned to the control room.  (*Id.* ¶ 36).  Plaintiff was inside the control room, separated from Griffin by a window with a large opening.  (*Id.* ¶ 37).  Plaintiff initially testified that

---

[2] The record contains no facts in support of Plaintiff's allegation that Griffin told her that she was weak.

3

Griffin returned the keys to her by sliding them along a table, but she later testified that Griffin threw the keys at her through the opening in the window. (*Id.* ¶ 38).

Plaintiff also complains that she overheard Mock state that Defendant County was "hiring too many blacks." (*Id.* ¶ 40).

At the November 20, 2012 meeting, Plaintiff complained to Tompkins about the race-based comments allegedly made by Griffin and Mock. (*Id.* ¶ 41). Tompkins apologized by saying: (1) "Sergeant Griffin was -- this was just his way, he does it to everybody, don't worry about it, just ignore him"; and (2) "[Defendant] County was not used to black people working [at the Prison]." (Pl. Depo. at 61:18-20; 72:9-10; and 73:5-13). At some undetermined point, Plaintiff told Frazier that she "felt like [she] was in a hostile work environment" and asked him for advice. (*Id.* at 94:13-95:2). She also spoke to Kimberly Noyes, an officer who worked at the Prison on weekends, "about how [Plaintiff] was being treated." (*Id.* at 118:3-4). Plaintiff believed that Officer Noyes was "going through something similar to what [Plaintiff] was going through with Griffin." (*Id.* at 118:3-6). Griffin's comments and conduct are the only examples of interactions with Prison employees that Plaintiff considers as harassment. (*Id.* 103:17-104:3). As a result of her complaints to Tompkins on November 20, 2012, Plaintiff was transferred to the Key supervised by Frazier. (Doc. 15 ¶ 42). Plaintiff considered her transfer to Frazier's key as being a "satisfactory resolution" of her complaints about race-based comments. (*Id.* ¶ 43).

Additionally, Plaintiff alleges that, during the term of her employment, she observed misconduct from two white male officers that was not met with disciplinary actions. She alleges that Officer Chris Hendley "came to work late every day," "was caught sleeping on the job [on] multiple occasions," and "got a DUI" but was not terminated for this conduct. (Pl. Depo. at 106:21, 106:23, and 107:5). She further alleges that Officer Thomas[3] was also "caught sleeping [on] numerous occasions" but was not terminated. (*Id.* at 107:2).

Plaintiff maintains that she is unaware of any policy, practice or custom of Defendant County that caused or contributed to a violation of her civil rights. (Doc. 15 ¶ 45). Plaintiff

---

[3] Plaintiff testified in her deposition that she did not recall the first name of Officer Thomas. (Pl. Depo. at 107:2).

received a copy of the Employment Handbook maintained by Defendant County. (*Id.* ¶ 46). The Handbook provides, in relevant part, that, "[a]ny employee who believes that they have been the victim of discriminatory harassment or sexual harassment is urged to report such conduct immediately to his/her supervisor, the County Administrator, or other appropriate official." (*Id.* ¶ 47). Plaintiff also stated that Defendant Terry did not harass or treat her differently because of her race. (*Id.* ¶ 48).

## PROCEDURAL BACKGROUND

On January 4, 2014, Plaintiff filed her Complaint against Defendants pursuant to 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII"), 42 U.S.C. § 1981 ("Section 1981" or "§ 1981"), and 42 U.S.C. § 1983 ("Section 1983" or "§ 1983") of the Civil Rights Act of 1964. (Doc. 1). On February 9, 2015, Defendants filed their Motion for Summary Judgment. (Doc. 11). On July 16, 2015, Plaintiff's attorney moved to withdraw as her attorney. (Doc. 20). On August 17, 2015, the Court granted the attorney's motion. (Doc. 21). Consequently, Plaintiff proceeds in this action *pro se*. On February 4, 2016, the Court issued a Notice to Plaintiff, informing her that her response to Defendants' Motion for Summary Judgment was due within thirty (30) days and of the possible consequences if she failed to respond. (Doc. 22). Plaintiff has failed to respond to Defendants' Motion. As such, Defendants' Motion for Summary Judgment is now ripe for review. *See* M.D. Ga. L.R. 7.3.1(a).

## SUMMARY JUDGMENT

**I.   Legal Standard**

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir.

2013).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of fact "is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact.  *See Celotex*, 477 U.S. at 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009).  The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *See Celotex*, 477 U.S. at 322-24.  Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586 (citations and internal quotations omitted).  Instead, the nonmovant must point to evidence in the record that would be admissible at trial.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form") (quotation omitted).  Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant.  *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual

inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor.  *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.   However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

To assist in meeting the Parties' respective burdens, Local Rule 56 requires the movant to attach to its motion for summary judgment a separate and concise statement of material facts to which the movant contends there is no genuine issue to be tried.  M.D. Ga. L.R. 56. The non-movant must then respond "to each of the movant's number material facts."  *Id.* "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate."  *Id.*   Here,   despite   the Court's Notice, Plaintiff did not file a response to Defendants' Motion for Summary Judgment.   Thus, Defendants' statements of material facts are admitted as a result of Plaintiff's failure to dispute those facts in accordance with Local Rule 56.   Nevertheless, the Court "cannot grant a motion for summary judgment based on default or as a sanction for failure to properly respond."  *United States v. Delbridge*, No. 1:06-CV-110-WLS, 2008 WL 1869867, at *3 (M.D. Ga. Feb. 22, 2008) (citing *Trustees of Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Employers v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1040 (11th Cir. 2004)).   Instead, the Court must undertake an independent review of "the evidentiary materials submitted in support of the motion" to ensure that the defendant has met its burden of demonstrating the absence of a genuine issue of material fact.  *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004); *see also Delbridge*, 2008 WL 1869867, at *3 (finding that the "Court must make an independent review of the record," even if the non-movant fails to respond to the statement of material facts ).

## II.  Discussion

Plaintiff brings claims against Defendants for unlawful discrimination based on race and retaliation, in violation of Title VII and § 1981.  Plaintiff also brings claims against Defendants pursuant to § 1983 for unlawful discrimination based on race and retaliation, in violation of the equal protection and due process clauses of the Fourteenth Amendment. Plaintiff further brings claims against Defendants under Georgia law for tortious interference with an employment contract and intentional infliction of emotional distress.

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Additionally, Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C.  §  2000e-3(a).  Similarly, Section 1981 proscribes discrimination based on race by providing that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).

Title VII and Section 1981 "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Consequently, courts analyze race discrimination claims under Title VII and Section 1981 simultaneously.  (*Id.*)  Here, it is undisputed that Plaintiff's Title VII and § 1981 claims arise from the same set of operative facts.  *See* (Doc. 1 ¶¶ 28, 30, 32, 34, and 38).  As such, the Court will address Plaintiff's Title VII claims with the understanding that its analysis applies to Plaintiff's Section 1981 claims as well.  *See Vessels v. Atlanta Independent Sch. Sys.*, 408 F.3d 763, (employing Title VII analytical framework to adjudicate claims brought under Title VII

and § 1981) (citing *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995); *Standard*, 161 F.3d at 1330.

Discrimination claims arising under Title VII may be based on either a hostile work environment or a disparate treatment theory. *See, e.g., Dominguez v. Lake Como Club*, 520 F. App'x 937, 940 (11th Cir. 2013). In Plaintiff's Complaint, she fails to state expressly which theory serves as predicate for her discrimination claims. Nevertheless, Plaintiff has failed to allege sufficient facts to support either theory.

### A. Mitchell County

#### 1. Title VII and Section 1981 Claims

Plaintiff fails to establish violations of Title VII or §1981 as she has not set forth facts sufficient to establish that she was subjected to a hostile work environment, disparate treatment, or that she was unlawfully retaliated against.

##### i. Hostile Work Environment

"A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (citing *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21 (1993)) (internal quotation marks omitted). A plaintiff has the burden of proving a hostile work environment claim. *Edwards v. Wallace Comty Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995). To establish a racially hostile work environment claim, Plaintiff must show that: (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment under a theory of direct or vicarious liability. *Miller*, 277 F.3d at 1275.

The fourth element of Plaintiff's harassment claim contains a subjective and an objective component. *Harris,* 510 U.S. at 21-22. In evaluating the objective severity of

alleged harassment, courts engage in a fact-intensive inquiry by considering, among other factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276; *see also Edwards*, 49 F.3d at 1521-22.  In so doing, courts must examine the conduct in its entirety, "not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775 (11th Cir. 1999); *see also McCann* 536 F.3d at 1378 ("Title VII prohibits a hostile work environment in which 'a series of separate acts . . . collectively constitute one 'unlawful employment practice.'") (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2008) (citing 42 U.S.C. § 2000e-5(e)(1)).  Title VII is not a "general civility code." *Faragher*, 524 U.S. at 788.

To the extent that the harassment to which Plaintiff alleges she was subjected was based on her race, no reasonable employee in Plaintiffs' position would conclude that the incidents were sufficiently frequent or severe to create a discriminatorily abusive working environment, or to interfere with their job performance.  Plaintiff alleges four specific examples of harassment during her thirty one days of employment at the Prison.  Of the four incidents, only two involved comments or behavior directed at her.  While a reasonable person in Plaintiff's position may have found the comments and conduct of Griffin and Mock offensive, the "mere utterance of a [racially derogatory comment] that engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  Furthermore, while there is no "magic number" of incidents that meet the objective severity requirement, the four incidents in the record do not evidence offensive conduct that is "so commonplace, overt [or] denigrating that they created an atmosphere [at the Prison that was] charged with racial hostility." *Edwards*, 49 F.3d at 1521.

Moreover, no evidence in the record indicates that the incidents of racial harassment to which Plaintiff alleged that she was subjected were humiliating or threatening.  Plaintiff

may argue that the key incident was threatening, but her recounting of the facts indicates that she found Griffin's behavior more rude than threatening.  Furthermore, given that Plaintiff initially said that Griffin slid the keys to her and later said he threw them, the Court does not credit her contention that she was threatened.  Finally, Plaintiff has failed to demonstrate that the harassment affected her ability to do her job.  To the contrary, Plaintiff alleges that her difficulties with the count were caused by her lack of familiarity with the procedures at the Prison and the failures of other officers.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to establish a claim for a racially hostile work environment.  Specifically, Plaintiff has failed to produce sufficient evidence from which a reasonable juror could conclude that her alleged race-based harassment resulted in both "an environment 'that a reasonable person would find hostile or abusive.'"  *Miller,* 277 F.3d at 1276 (quoting *Harris*, 510 U.S. at 21).

### ii.  Disparate Treatment

Plaintiff claims that Defendants subjected her to disparate treatment by terminating her employment because of her race.  Where, as here, the record contains no direct evidence in support of Plaintiff's claim, courts evaluate the circumstantial evidence supporting such Title VII claims under the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green.*  411 U.S. 792, 802-04 (1973).  *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527 (11th Cir. 1997) (under the *McDonnell Douglas* framework, a plaintiff "may present sufficient circumstantial evidence of discrimination to create a jury question.").  To establish a prima facie case for disparate treatment, a plaintiff must show that: "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated [white] employees more favorably; and (4) she was qualified to do the job."  *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).  If a plaintiff establishes her prima facie case, a defendant must provide a legitimate, nondiscriminatory reason for its action.  *Id.*  If the defendant satisfies this burden, the plaintiff must then prove that the defendant's reasons are a pretext for unlawful discrimination.  *Id.*  Throughout this

process, the "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

There is no dispute that Plaintiff meets the first, second, and fourth elements of her prima facie case.  Plaintiff, however, has failed to show that Defendants treated a similarly situated comparator more favorably than Plaintiff.  In determining whether employees are similarly situated, courts evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).   "The quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1263, 1286 (11th Cir. 2006) (quotation marks omitted).  Indeed, "the misconduct for which [the plaintiff was discharged [must be] nearly identical to that engaged in by an employee outside the protected class whom the employer retained." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984).

Here, Plaintiff identified two purported comparators: Chris Hendley ("Officer Hendley") and "Officer Thomas," two white correctional officers.  (Pl. Depo. at 105:22-108:23 and 119:7-120:22).  Plaintiff testified that Officer Hendley "came to work late every day", "was caught sleeping on the job [on] multiple occasions," and "got a DUI" but was not terminated for this conduct.  (*Id.* at 106:21, 106:23, and 107:5).  Plaintiff also testified that Officer Thomas was "caught sleeping [on] numerous occasions" but was not terminated either.  (*Id.* at 107:2).  However, neither officer is a proper comparator as neither was involved in or accused of inaccurately recording the inmate count "at least every other day" over the course of a month.  (*Id.* at 51:16).  As such, Plaintiff fails to satisfy the third element of her prima facie case.  *See McCann v. Tillman*, 526 F.3d 1370, 1374 (2008) (holding that district court properly granted summary judgment in employer's favor because neither of the two comparators identified by plaintiff were "examples of white employees who[, like plaintiff] violated the [employer's] uniform directive, or who similarly abused the indicia or

privileges of their office but were not disciplined.").

### iii. Retaliation

Plaintiff claims that Defendants retaliated against her, in violation of Title VII.  In support of her claim, Plaintiff alleges that she was transferred from the day shift Key supervised by Griffin to another supervised by Frazier after complaining to Tompkins about the comments made by Griffin and Mock.  (Pl. Depo. at 82:20-85:3).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) some causal relation exists between the two events.  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  "Once the prima facie case is established, the employer must proffer a legitimate, nondiscriminatory reason for the adverse employment action.  The plaintiff must then demonstrate that the employer's proffered explanations are a pretext for retaliation. . . ."  *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994); *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (setting forth the burden-shifting framework for a retaliation claim under Title VII).

While Plaintiff meets the first element of her prima facie case, Plaintiff has not submitted evidence showing that she suffered an adverse employment action.  Adverse actions that courts deem actionable "extend[] beyond workplace-related or employment-related retaliatory acts and harm."  *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  A "plaintiff [must] show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might have well dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 67 (internal quotation marks and citation omitted).  The "standard of judging harm must be objective[]" but, because Title VII "does not set forth a general civility code for the American workplace," the material adversity alleged must be a significant, not a trivial harm.  *Id.* at 68 (internal citation omitted).  "[A] transfer to a new position can be deemed adverse if it involves a reduction in pay, prestige, or responsibility.  *Hinson v. Clinch Cty., Georgia Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000).

The record contains no evidence that Plaintiff suffered any "reduction in pay, prestige, or responsibility" after she was transferred to Frazier's key.  In addition, Plaintiff testified that her transfer to the Key supervised by Frazier was "a satisfactory resolution" to her complaints about Griffin and Mock's comments.  (Pl. Depo. at 65:19-21).  As the record contains no evidence that Plaintiff's transfer caused her significant harm or that the transfer was adverse, Plaintiff fails to establish a prima facie claim for retaliation under Title VII.

### 2.  Section 1983 Claims

Plaintiff's § 1983 claims against Defendant County fail because Plaintiff has not shown that Defendant County has an official policy, custom, or practice of racial discrimination.  It is well-settled that "[m]unicipalities and local government units cannot be found liable under § 1983 under a *respondeat superior* or vicarious liability theory."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  "Instead, in order to recover against a municipality, a plaintiff must establish that the alleged racial discrimination or harassment occurred pursuant to a custom or policy of the municipality."  *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).  "A plaintiff . . . has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county."  *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1329 (11th Cir. 2003)(citations omitted).  However, "final policy making authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review."  *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997).

The record contains no evidence demonstrating that any alleged violations of Plaintiff's rights were the result of an official policy of Defendant County.  The prison has an Employee Handbook (the "Handbook").  (Pl. Depo. at 121:1-16).  The Handbook's provisions prohibit discriminatory harassment and direct employees to appeal decisions of Prison officials regarding complaints of harassment to the County Administrator.  *See* (*Id.* at 122:5-9).  Plaintiff testified that she received a copy of the Handbook.  (*Id.* at 121:13-16).

Likewise, the record contains no evidence demonstrating that any alleged violations of

Plaintiff's rights were the result of Defendant County's custom or practice, as manifested through the acts of a final policymaker for Defendant County. The Handbook put Plaintiff on notice that Defendant Terry did not have "final policy making authority" over complaints of discriminatory harassment at the Prison, as such matters were subject to review by the County Administrator. Furthermore, even if Plaintiff had viewed the transfer as discriminatory rather than as a "satisfactory resolution" of her issues with Griffin, Plaintiff failed to avail herself of administrative review by appealing the decision to the County Administrator. Based on this evidence, Plaintiff cannot establish Defendant County's municipal liability for her § 1983 claims.

### B. Defendant Terry

#### 1. Title VII and Section 1981 Claims

In this action, Plaintiff brings Title VII and § 1981 discrimination and retaliation claims against Defendant Terry in his official capacity as warden of the Prison and in his individual capacity. However, Claims brought under Title VII may only be brought against an employer because "[t]he relief granted under Title VII is against the employer, not individual employees whose actions constitute a violation of the Act." *Busby*, 931 F.2d at 772. Accordingly, as Defendant Terry was not Plaintiff's employer, Plaintiff cannot state a claim for a violation of Title VII or § 1981 against Defendant Terry.

#### 2. Section 1983 Claims

Plaintiff also brings Fourteenth Amendment equal protection and due process claims through § 1983 against Defendant Terry in his official capacity and individual capacity. However, a § 1983 claim against an official in his individual capacity is "simply another way of pleading an action against an entity of which the officer is an agent." *Busby* 931 F.2d at 776 (internal quotation marks omitted); *see also Flowers v. Troup County, Ga. Sch. Dist.*, 1 F. Supp.3d 1363, 1369 (N.D. Ga. 2014). Plaintiff's claims against Defendant Terry are duplicative of her claims against Defendant County and fail because Plaintiff has not demonstrated that Defendant County has an official policy, custom, or practice of racial discrimination.

### C. State Law Claims

Once a plaintiff's federal claims are dismissed, "there remains no independent original federal jurisdiction to support the Court's exercise of supplemental jurisdiction over the state claims against Defendant." *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997).   Pursuant to 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction over claims after it has dismissed all claims over which it has original jurisdiction.   "The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004). "Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." *Baggett*, 117 F.3d at 1353 (citing P*almer v. Hosp. Auth. of Randolph Cty.*, 22 F.3d 1559, 1569 (11th Cir. 1994).   The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney*, 70 F.3d at 1089.

Plaintiff's state law claims for tortious interference with an employment contract and intentional infliction of emotional distress are dismissed to allow Plaintiff to pursue her claims in a more appropriate forum.  The state court is best equipped to research and rule on matters of state law, and comity would suggest that it should be allowed to do so.  In addition, Section 1367(d) gives "the plaintiff at least 30 days to re-file in state court after a federal court declines to exercise supplemental jurisdiction," thereby removing "the principal reason for retaining a case in federal court when the federal claim belatedly disappears." *Personalized Media Commc'ns, LLC v. Scientific–Atlantic, Inc.*, 493 F. App'x 78, 82 n.1 (11th Cir. 2012); *see also* 28 U.S.C. § 1367(d) (providing that state law claims asserted in federal court along with "related" federal claims "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed").  While it may be convenient for the Parties to continue litigating this case in this Court, neither judicial economy nor fairness to other litigants supports retaining jurisdiction over Plaintiff's state law claims while delaying justice in other cases where the Court retains original jurisdiction.

**III.**   <u>**Conclusion**</u>

In light of the foregoing, Defendants' Motion for Summary Judgment, (Doc. 11), on Plaintiff's Title VII, § 1981 and § 1983 claims is **GRANTED**.   Furthermore, Plaintiff's remaining state law claims are **DISMISSED without prejudice.**

**SO ORDERED**, this __1st__ day of June, 2016.

_/s/ Leslie J. Abrams_____
**LESLIE J. ABRAMS, JUDGE**
**UNITED STATES DISTRICT COURT**